UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM LEONARD, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:05-CV-01015-MEF-CSC |
| vs. | ) | |
| | ) | |
| RELIASTAR LIFE INSURANCE | ) | |
| COMPANY f/k/a NORTHWESTERN | ) | |
| NATIONAL LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT RELIASTAR LIFE INSURANCE COMPANY'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rules 12(b)(6) and 56(b) of the Federal Rules of Civil Procedure, Defendant

ReliaStar Life Insurance Company ("ReliaStar") hereby moves the Court for an Order dismissing

the First Amended Complaint and striking the plaintiff's class allegations or, in the alternative,

granting summary judgment. For the reasons set forth below, the undisputed facts demonstrate

that plaintiff's claims are time barred by the statute of limitations. Because these undisputed

facts are readily ascertainable from plaintiff's policy records, which plaintiff has failed to attach

to his complaint, ReliaStar is submitting these records with two supporting affidavits. ReliaStar

requests that this Court convert this motion into one for summary judgment and dismiss the First

Amended Complaint with prejudice.

## INTRODUCTION

The First Amended Complaint is based entirely on claims that purportedly arise out of the

plaintiff's purchase ***nearly twenty years ago*** of a "Flexible Premium Adjustable Whole Life

Insurance Policy" with a face amount of $50,000 (the "Policy"). Directly contrary to the Policy's express provision that no agent "can change this contract" (Policy at 2), the plaintiff complains that, in 1986, his insurance agent orally "guaranteed" that if he continued to make a "fixed" premium payment of $37.00 every two weeks, the Policy would "always" remain in force and never lapse.[1] The plaintiff makes this allegation notwithstanding that the Policy contains no such guaranty but rather contains a guaranty not to lapse only for three years, provided the plaintiff pays a certain minimum monthly premium.[2]

The Policy is a "universal life" insurance policy, meaning that the premiums are "flexible" (not fixed), and that the plaintiff determines the amount and frequency of his premium payments. ReliaStar sends premium notices based on the frequency and method of payment selected. Policy at 4. The Policy expressly explains that "[t]he amount and frequency of premium payments will affect the accumulation value and cash value *and how long the insurance will remain in effect.*" *Id.* (emphasis added). As is customary with universal life policies, the plaintiff's Policy provides that he will receive an annual report every year. *Id.* at 16. ReliaStar's annual reports provide itemized detail on the premiums paid, the interest rates credited, the costs of insurance, expenses charged, and the ending value of the Policy for every month in the year.[3] In addition to notifying a policyholder of changes in the interest rate, the annual reports explain when the Policy can be expected to lapse under different interest rate scenarios.

---

[1] *See* First Amended Complaint ¶ 6(b)(i) and ¶ 11 ("Am. Compl.").

[2] *See* Policy at 5 ("Grace Period"). A copy of the Policy is attached as Exhibit "1" to the Affidavit of Brian J. Boschert, Exhibit "A" hereto (the "Boschert Aff.").

[3] Copies of plaintiff's Annual Reports are attached as composite Exhibit "3" to the Boschert Affidavit.

Notwithstanding the premium provisions in his Policy, and despite receiving detailed annual reports <u>every year</u> for eighteen years, the plaintiff professes complete ignorance over the nature of his Policy and how his Policy was performing. He accuses ReliaStar of selling him an "under-funded" policy (Am. Compl. ¶¶ 13, 30, 37), even though at inception the Policy is funded only with an initial premium and the plaintiff fully controls how much he funds the Policy over time. Ignoring the decline in interest rates since 1986,[4] the plaintiff complains that the alleged "under-funding" was caused by the cost of a $50,000 Term Insurance Rider (*id.*), which he also purchased along with the Policy. The plaintiff makes this claim although the annual reports detailed exactly how much the Term Insurance Rider cost, and he could have cancelled the rider at any time, as he eventually did in 2005. *See* Boschert Aff. ¶ 8 & Ex. 6.

The plaintiff alleges that the Policy was "not as promised by Defendants," Am. Compl. ¶ 16, but he offers no explanation as to why he did not discover this alleged claim in 1986 when the Policy was issued. Any reasonable person reading the Policy would immediately recognize that it does not provide that premium payments "would stay level and/or fixed" (Am. Compl. ¶ 6 (b)(i)), nor does the Policy guarantee that it will never lapse. It guarantees a minimum interest rate of 4.5%, and provides for a limited three-year no-lapse period. Policy at 5, 7. Under well established law, the plaintiff's purported claims against ReliaStar accrued when he purchased the Policy in 1986. At the very latest, he had actual notice of his purported claims in 1993, when his annual report expressly advised that his Policy could lapse even if he continued to pay his planned periodic premiums. Because the statute of limitations expired long ago, plaintiff's claims are time barred and should be dismissed with prejudice.

---

[4] The interest rate for the Policy, which was fully disclosed to the plaintiff each year, declined from 9.75% in 1987 to the guaranteed minimum of 4.5% in 2003. Boschert Aff. Ex. 3.

In addition to being barred by the statute of limitations, the plaintiff's claims suffer from other serious legal defects. The plaintiff's fraud claims are untenable because, as a matter of law, he could not reasonably rely on the agent's purported oral misrepresentations, and the plaintiff's other tort claims suffer from similar defects. The plaintiff's count for breach of contract is utterly without merit and fails to identify any term of the insurance contract breached by ReliaStar.

Finally, the Court should strike and dismiss the multi-state class action allegations because the First Amended Complaint concedes that fifty different state laws would need to be applied, and Eleventh Circuit law is clear that a fraud claim would be inherently unmanageable under these circumstances.

## STATEMENT OF FACTS

### A.    "Universal Life" Insurance

Universal life insurance was specifically developed to provide consumers with the flexibility to change the amount of their premium payments and the face amount of their insurance, according to changes in their own individual needs and circumstances. "UL" policies "are *flexible* in that they permit policyowners, within limits, to increase or decrease (even to zero) premium payments as they wish, and also, subject to certain constraints, to increase or decrease the policy face amount." KENNETH BLACK, JR. AND HAROLD D. SKIPPER, JR., LIFE INSURANCE at 39 (13th ed. 2000) (hereinafter "BLACK & SKIPPER") (emphasis added).

In addition to life insurance benefits, universal life insurance also involves a savings component called "cash value," which can accumulate or decrease, depending upon interest rates and the amount of premium that the policyholder decides to pay. If the cash value is sufficient to cover the cost of insurance (expense and mortality charges), no premium need be paid. "If the

4

previous period's cash value is not sufficient, the policy will lapse in the absence of a further premium payment." BLACK & SKIPPER at 117. In connection with UL insurance, the insurer will send the policyholder "annual reports" that review the performance of the policy and set forth the policy expenses, cost of insurance, credits, as well as the resulting cash value of the policy. *Id.* at 116.[5]

**B.    Approval of ReliaStar's Flexible Premium Policy and Term Insurance Rider**

In August 1983, Northwestern National Life Insurance Company ("Northwestern National"), now known as ReliaStar, filed a request with the Alabama Department of Insurance (the "Department") to approve Flexible Premium Adjustable Whole Life Insurance Policy, Form number 82-800. *See* Affidavit of Wendy Paquin (the "Paquin Aff.") (Ex. "B" hereto) ¶ 3. Policy Form 82-800 was the same form of policy issued to William J. Leonard, Jr. effective on or about September 24, 1986. *Id.* Policy Form 82-800, which includes the costs of insurance and all other policy charges, was reviewed and expressly approved by the Department on August 11, 1983. *Id.* A copy of Policy Form 82-800 bearing the Alabama Department's "APPROVED" stamp dated August 11, 1983 is attached to the Paquin Affidavit as Exhibit "1."

Northwestern National filed a similar request with the Department on October 26, 1984 for approval of Term Insurance Rider, Form number 82-370. *Id.* ¶ 4. Term Insurance Rider Form 82-370 was the same form issued to William J. Leonard, Jr. as part of his policy number B2-076-716. *Id.* Term Insurance Rider Form 82-370, which includes the costs of insurance (the only charge associated with the rider), was reviewed and expressly approved by the Department

---

[5] Universal life policies have been described as "transparent" because the policyholder can see exactly how the policy is performing. *See* BLACK & SKIPPER at 116 ("UL policies are transparent in their operation . . . . The policyowner is able to see how funds are allocated to the various policy elements."); *see also In re CM Holdings, Inc.*, 254 B.R. 578, 585 (D. Del. 2000) ("all the features of the policy are unbundled to allow the policyholder to see how the money is used").

on November 1, 1984. *Id*. A copy of Term Insurance Rider Form 82-370 bearing the Alabama Department's "APPROVED" stamp is attached to the Paquin Affidavit as Exhibit "2."

## C.    The Plaintiff's Policy

In the Fall of 1986, the plaintiff applied for a universal life insurance policy and term insurance rider from Northwestern National Life (hereinafter "ReliaStar"). Effective September 24, 1986, ReliaStar issued a Flexible Premium Adjustable Whole Life Insurance Policy (Policy No. B2-076-716) (the "Policy") with a face amount of $50,000, and a Term Insurance Rider with a face amount of $50,000 for a total death benefit of $100,000. *See* Policy at RLI-3-4; Am. Compl. ¶¶ 10-12. The Policy did not guarantee that interest rates would "always" remain the same, nor did it guarantee that the policy would remain in force forever. Rather, the Policy provided a guaranteed minimum interest rate of 4.5% and a no-lapse period of three years if the plaintiff paid the Minimum Monthly Premium of $78.00. Policy at 5, 7; RLI-3. The Policy also contained a "free look" provision, which gave the plaintiff ten days to examine the Policy and return it for any reason with a full refund of all premiums paid. Policy at 1 ("Right to Return Policy"). The plaintiff made no attempt to return the Policy.

### 1.    Premium Provisions

The Policy contains simple, unambiguous language that makes it unequivocally clear that the premium payments are flexible and not "fixed" at any particular amount. Indeed, the name of the Policy itself ("Flexible Premium Adjustable Whole Life Policy") reveals the flexible nature of the premiums. The Policy states:

> The amount and frequency of the planned periodic premiums you have chosen are shown on the Policy Data Page. ***You may change the frequency and amount of planned period premiums by notifying us in writing of the change.***

Policy at 4 (emphasis added). The policyholder can make unscheduled additional premium payments at any time: "Premium payments other than the planned periodic premiums may be made at any time while this policy is in force." *Id.* Further, the Policy plainly discloses that "The amount and Frequency of premium payments will affect the accumulation value and cash value and *how long the insurance will remain in effect*." *Id.* (emphasis added).

### 2. Policy Lapse Provisions

Nowhere does the Policy state that it will stay in force forever, or that the payment of any "fixed" premium will prevent the policy from lapsing. To the contrary, the Policy provides a limited three year no-lapse period if the policyholder pays the Minimum Monthly Premium:

> We will not lapse this policy during the first 3 policy years, if on each Monthly Anniversary Date during the period, 1 is greater than 2, where:
>
> 1
> Is the sum of all premiums paid to date minus any policy loans and partial withdrawals; and
>
> 2
> Is the sum of the Minimum Monthly Premiums since the Policy Date, including the month following the Monthly Anniversary Date.

*See* Policy at 5. This provision makes it plain that there is *no guarantee that the Policy will not lapse after three years*.

The Policy stays in force as long as the cash value is sufficient to pay the monthly cost of the Policy. The Policy provides that it will enter a "Grace Period" of 61 days if the cash value on a monthly anniversary day is not enough to cover the monthly deductions for the following month:

> If, on any Monthly Anniversary Date, the cash value minus any policy loans is less than the monthly deduction for the policy month to follow, we will give you a grace period of 61 days to pay a premium large enough to cover the monthly deduction. We will

7

> send you notice of the required premium at least 30 days before we
> lapse this policy.

Policy at 5. The "Monthly Deduction" is also defined under the Policy to be the sum of the cost

of insurance, monthly policy charges, and any monthly administrative charge. *Id.* at 7.

If the policyholder allows the Policy to enter the Grace Period and thereafter fails to pay a

premium large enough to cover the Monthly Deduction, the Policy will lapse and all coverage

will terminate:

> If that required premium is not paid within the grace period, we
> lapse this policy. A lapsed policy is no longer in force and has no
> cash value.

*Id*. at 5.

## D.    Statement of Policy Cost and Benefit Information

Attached as Exhibit "2" to the Boschert Affidavit is a copy of the Statement of Policy

Cost and Benefit Information (the "Policy Statement) that was delivered to the plaintiff along

with the Policy in 1986. Boschert Aff. ¶ 4. The Policy Statement illustrates that the $100,000

death benefit was guaranteed for three years and no longer:

| POLICY YEAR | END OF YEAR DEATH BENEFIT | | END OF YEAR CASH VALUE | |
|---|---|---|---|---|
| | **GUARANTEED** | **CURRENT** | **GUARANTEED** | **CURRENT** |
| 1 | $100,000 | $100,000 | $0.00 | $0.00 |
| 2 | $100,000 | $100,000 | $0.00 | $27.99 |
| 3 | $100,000 | $100,000 | $0.00 | $651.91 |
| 4 | $0 | $100,000 | $0.00 | $1,306.70 |
| 5 | $0 | $100,000 | $0.00 | $1,992.93 |
| 10 | $0 | $100,000 | $0.00 | $6,424.77 |
| 15 | $0 | $100,000 | $0.00 | $11,329.34 |
| 20 | $0 | $100,000 | $0.00 | $15,396.39 |
| 25 | $0 | $100,000 | $0.00 | $18,190.09 |
| 30 | $0 | $100,000 | $0.00 | $16,114.75 |

Policy Statement at 2, Boschert Aff. ¶ 4.

## E.    Annual Reports

The Policy provides:  "Each year we will send you free of charge an annual report showing your cash value and accumulation value as of the date of the report, the premiums paid, interest credited, and the loans and charges since the last report."  Policy at 16.  The plaintiff was sent an Annual Report every year.  Boschert Aff. ¶ 5.  These Annual Reports illustrated exactly how the Policy was performing.  Among other things, the Annual Reports showed the changes in the Policy's accumulated value, the effect of premium payments and amount of interest added to the value, and the exact amount of costs and expenses deducted from the value.  Boschert Aff. Ex. 3.  For example, each Annual Report stated the interest rate credited to new premiums and expressly disclosed the cost of insurance for both the universal life coverage and the Term Insurance Rider (and the fact that the cost of insurance increases each year).  The following table summarizes this information received by plaintiff over an 18-year period:

| Annual Report | Interest Rate | Cost of Insurance Charge | Rider Insurance Charge |
|---|---|---|---|
| 1987 | 9.75% | $179.06 | $144.00 |
| 1988 | 9.75% | $191.38 | $156.96 |
| 1989 | 9.25% | $205.19 | $171.48 |
| 1990 | 9.25% | $219.98 | $185.04 |
| 1991 | 8.75% | $234.74 | $199.56 |
| 1992 | 8.00% | $259.35 | $216.48 |
| 1993 | 7.25% | $280.93 | $234.00 |
| 1994 | 7.00% | $301.36 | $255.00 |
| 1995 | 7.00% | $328.21 | $283.56 |
| 1996 | 6.65% | $349.47 | $315.48 |
| 1997 | 6.40% | $375.88 | $350.04 |
| 1998 | 6.15% | $403.99 | $386.52 |
| 1999 | 5.50% | $433.12 | $423.96 |
| 2000 | 5.20% | $469.45 | $469.56 |
| 2001 | 5.00% | $512.02 | $518.04 |
| 2002 | 5.00% | $559.26 | $575.52 |
| 2003 | 4.50% | $612.60 | $638.04 |
| 2004 | 4.50% | $670.57 | $708.96 |

*See* Boschert Aff. Ex. 3.

The first page of each Annual Report also contains conspicuous "***Important Notices,***" which include statements explaining when the Policy can be expected to lapse (a) if no premiums are paid, or (b) ***if the current premium is continued to be paid***. *Id.* (emphasis added). ***Beginning as far back as 1993***, the plaintiff was repeatedly informed that if he continued making only his planned periodic premium payments, ***the Policy would lapse at some point in the future***. For example, the 12/01/93 Annual Report disclosed the following:

> If planned periodic premiums are continued, assuming a 7.25% interest rate and current charges, your cash value will be depleted and ***your policy will lapse on 10/01/2014***. Assuming 4.50% interest and guaranteed charges, your cash value will be depleted and ***your policy will lapse on 8/01/2000***.

Boschert Aff. Ex. 3 at RLI-52 (emphasis added). Accordingly, in 1993, ***twelve years prior to filing the complaint in this action***, the plaintiff was expressly advised that, even if the interest rate stayed at 7.25%, the Policy would lapse in the year 2014 (when the plaintiff was 75 years of age); and assuming the minimum interest rate of 4.50%, the Policy would have lapsed in the year 2000 (when plaintiff was 61 years of age). A similar disclosure appeared in <u>every</u> subsequent Annual Report since 1993. *See* Boschert Aff. Ex. 3.[6]

## F.    Plaintiff Removes Term Insurance Rider and Opts For "Reduced Paid Up" Insurance

On February 4, 2005, plaintiff telephoned ReliaStar and asked whether he could remove the Term Insurance Rider from the Policy. Boschert Aff. ¶ 8. ReliaStar sent plaintiff a Service

---

[6] For example, the December 1, 2004 Annual Report stated: "If planned periodic premiums are continued, assuming a 4.50% interest rate and current charges, your cash value will be depleted and ***your policy will lapse on 5/01/2012***. Assuming 4.50% interest and guaranteed charges, your cash value will be depleted and ***your policy will lapse on 1/01/2008***." Boschert Aff. Ex. 3 at RLI-74 (emphasis added).

Request form to implement his requested change along with an illustration showing Policy values without the Term Insurance Rider. *Id.* On February 7, 2005, plaintiff executed the form and canceled the Term Insurance Rider. *Id.* & Ex. 6.

On or about February 9, 2005, plaintiff requested a form to convert his Policy to a reduced paid up policy as he was permitted to do under the terms of the Policy. Policy at 8; Boschert Aff. ¶ 9. On February 23, 2005, plaintiff executed the form and converted his Policy. Boschert Aff. ¶ 9 & Ex. 8. Plaintiff's paid up Policy has a face amount of $12,826. Boschert Aff. ¶ 9 & Ex. 9. Since February 2005, plaintiff no longer pays any premiums to ReliaStar. Boschert Aff. ¶ 9.[7]

### G.    The First Amended Complaint

Plaintiff filed his First Amended Complaint on January 20, 2006. He claims that his Policy was defective from inception because it "would eventually lapse prior to its maturity date regardless of whether credited interest rates declined." Am. Compl. ¶¶ 13, 30, 37. He further alleges that he purchased the Policy in reliance upon an oral representation by his agent that "the initial premium established and required by Defendant was and would always be adequate to fund the original policy." *Id.* ¶¶ 11-12, 28-29.

The First Amended Complaint includes six different "counts" for the following claims: fraud (Count One), suppression or failure to disclose (Count Two), negligent hiring, training, and supervision (Count Three), wanton hiring, training, and supervision (Count Four), negligent/wanton failure to procure a suitable product (Count Five), and breach of contract (Count Six). For the reasons set forth below, the undisputed facts demonstrate that all of these

---

[7] The correspondence regarding Policy changes, including the forms that plaintiff executed and returned to the company, were all sent to the same address where plaintiff's Annual Reports were sent. Boschert Aff. ¶ 10.

claims should be dismissed with prejudice, and ReliaStar is entitled to summary judgment as a matter of law.

## LEGAL STANDARDS

Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, when matters outside the pleadings are presented with a motion to dismiss for failure to state a claim, the Court may treat the motion as one for summary judgment under Rule 56. Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, a party opposing a motion for summary judgment may not rest upon mere allegations of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990). Summary judgment is designed to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.*, 475 U.S. at 587. To require a trial, however, when it is clear from the materials in the record that the plaintiff cannot

prove his claim is "a waste of time and resources," and unnecessarily restricts the proper use of summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

## ARGUMENT

## I.    THE COURT SHOULD TREAT THE MOTION TO DISMISS AS ONE FOR SUMMARY JUDGMENT AND GRANT SUMMARY JUDGMENT IN FAVOR OF RELIASTAR AS A MATTER OF LAW

### A.    The Plaintiff's Claims Are Time Barred By Alabama's Statute Of Limitations

Alabama imposes a two-year limitations period on tort claims and a six-year period on breach of contract claims. Ala. Code §§ 6-2-34(4), 38(*l*). Plaintiff's First Amended Complaint, however, is clearly time barred because it is based on conduct that was allegedly committed in 1986 (Am. Compl. ¶¶ 10 & 27), *over nineteen years* before this action was filed.

### 1.    Plaintiff's fraudulent misrepresentation and omission claims are time barred

Plaintiff's fraud claims (Counts I & II) are time barred for reasons similar to those expressed by this Court in *Owens v. Life Insurance Co. of Georgia*, 289 F. Supp. 2d 1319, 1325 (M.D. Ala. 2003). Plaintiff's fraud claims accrued when he paid his first premium on the Policy in 1986. He cannot rely on the discovery rule to toll the limitations period because the Policy, Policy Statement, and Annual Reports delivered to plaintiff were sufficient to put any reasonable person on notice of the alleged fraud. Plaintiff's fraud claims are thus plainly time barred by Alabama's two-year statute of limitations. Ala. Code § 6-2-38(*l*).

### a.    Plaintiff's fraud claims accrued when the plaintiff paid his first premium

The statute of limitations began to run on the plaintiff's alleged fraud claim when he paid his first premium on the Policy. *Donoghue v. Am. Nat'l Ins. Co.,* 838 So. 2d 1032, 1037 (Ala. 2002) (a claim of fraud based on purported misrepresentations that a life insurance policy would

13

provide a $125,000 retirement fund if planned premiums were continued until age 65 accrued when the first premium was paid); *see also Alfa Life Ins. Co. v. Jackson,* 906 So. 2d 143, 151 (Ala. 2005) ("[A] claim that the plaintiff-insured was misled to pay premiums for a policy by representations that the policy would contain a coverage or feature that the subsequently issued policy did not in fact contain, *is ripe* as soon as the plaintiff-insured pays a premium.") (emphasis in original) (citations omitted).[8]

*Williamson v. Indianapolis Life Insurance Co.,* 741 So. 2d 1057, 1061 (Ala. 1999) is inapplicable to the present situation. In *Williamson,* the Alabama Supreme Court held that claims relating to the performance of a "vanishing" premium policy were not ripe for adjudication until after the purported "vanish date" passes. The Alabama Supreme Court, however, significantly retreated from its holding in *Williamson* earlier this year and limited *Williamson* to claims based on vanishing premium policies. *See Alfa Life,* 906 So. 2d at 151.

In this case, as in *Alfa Life,* the plaintiff alleges he was damaged when he "made payments on a policy that was not represented." Am. Compl. ¶ 35; *see also id.* ¶ 17 (the plaintiff purchased a "product" that was "not as promised"). *Williamson* is inapplicable here because the First Amended Complaint does not involve a vanishing premium policy. Moreover, the First Amended Complaint disavows any linkage to interest rates and alleges instead that the plaintiff suffered damages when he received a "defective" product at the point of sale. Am. Compl. ¶¶ 13, 30 & 37 (the Policy would "eventually lapse prior to its maturity date *regardless*

---

[8] *Accord Stephens v. Equitable Life Assurance Soc'y*, 850 So. 2d 78 (Miss. 2003). In *Stephens*, the Mississippi Supreme Court held that a claim for fraud in the sale of a life insurance policy accrues upon "completion of the sale." *Id.* at 81; *see also id.* at 83 ("The purchase of the policies were made in 1972; thus the causes of action accrued in 1972."); *see also Robinson v. Southern Farm Bureau Cas. Co.*, 915 So. 2d 516, 519 (Miss. Ct. App. 2005) ("The three year statute of limitations for fraud begins to accrue upon the purchase of an insurance policy.") (citing *Stephens*).

14

*of whether credited interest rates declined"*) (emphasis added). Accordingly, under *Alfa Life* and other decisions by the Alabama Supreme Court, the plaintiff's fraud claims accrued in 1986 when he purchased the Policy and paid his first premium, and his First Amended Complaint is thus time barred.[9]

**b.    The plaintiff cannot, as a matter of law, satisfy his burden to establish tolling of the statute of limitations**

The plaintiff cannot benefit from any tolling of the statute of limitations here. The Alabama Supreme Court maintains that the "burden" of establishing the benefit of the tolling provision is "on the party bringing an action for fraud." *Parsons Steel, Inc. v. Beasley,* 522 So. 2d 253, 256 (Ala. 1988) (citing *Lampliter Dinner Theater, Inc. v. Liberty Mut. Ins. Co.,* 792 F.2d 1036 (11th Cir. 1986)). As a matter of law, plaintiff cannot meet his burden.

In *Foremost Insurance Co. v. Parham,* 693 So. 2d 409, 421 (Ala. 1997), the Alabama Supreme Court reestablished the "duty to read documents received in connection with a particular transaction." *Owens v. Life Ins. Co. of Ga.,* 289 F. Supp. 2d 1319, 1325 (M.D. Ala. 2003). Under *Foremost,* "(1) actual discovery [of] the alleged fraud; or (2) receipt of a document or contract alerting the plaintiff to the possibility of fraud, if the plaintiff could have read and understood such document and chose to ignore its written terms" ends any tolling of the statute of limitations. *Id.*[10]

---

[9] This case is also distinguishable from *Farrar v. ReliaStar Life Insurance Co.,* No. 2:03cv1135-D, slip op. at 7 (M.D. Ala. June 18, 2004), where the court found that the plaintiff's claims did not become ripe for many years because: "Like the policies in *Williamson,* the ability of Plaintiffs' policies to sustain themselves at a level premium [was] tied to interest rates." Here, plaintiff claims that the Policy was defective from inception and that sustaining the interest rate is irrelevant to the policy lapsing. Am. Compl. ¶¶ 13, 30 & 37. The complaint in *Farrar* contained no similar allegation. *Farrar,* No. 2:03cv1135-D (D.E. 1).

[10] *See also Fowler v. Provident Life & Accident Ins. Co.,* 256 F. Supp. 2d 1243, 1249 (N.D. Ala. 2003) ("the plaintiff should have discovered the possibility of fraud and misrepresentation" when she received her policy that contained terms that differed from the

The alleged oral representations in this case (that the initial premium would "always be adequate to fund" $100,000 of life insurance coverage (Am. Compl. ¶¶ 11, 28)) are similar to those addressed by this Court in *Owens*, where the insurance agent purportedly misrepresented that "the amount of insurance coverage would never fall below the face amount of $15,000." 289 F. Supp. 2d at 1321. Owens purchased his policy from the defendant in 1984 but sued eighteen years later. *Id.* Long before commencing the lawsuit, however, Owens's policy contained information contradicting the agent's alleged misrepresentations. *Id.* at 1326. Applying the rule reestablished in *Foremost,* this Court determined that plaintiff "had in his possession documents which contradicted the alleged oral misrepresentations." Accordingly, Owens "should have discovered the possibility of fraud and misrepresentation in 1984 when he purchased the policy, and the two year statute of limitations commenced running at that time." *Id.* Owens's claims were thus dismissed as time barred. *Id.* at 1327.

Similarly, in *Casassa v. Liberty Life Insurance Co.,* 949 F. Supp. 825, 827 (M.D. Ala. 1996), this Court, in granting summary judgment, found that the plaintiff's policy contradicted the alleged misrepresentations where the policy disclosed that coverage might expire where insufficient premiums are paid. *Id.* at 829. Additionally, in 1988, Casassa received an annual report that projected the policy's future cash value based on possible interest rates if all premiums were paid as planned. *Id.* Notwithstanding plaintiff's argument that he did not

---

purported misrepresentations about the policy); *Auto Owners Ins. Co. v. Abston,* 822 So. 2d 1187, 1195 (Ala. 2001) ("the limitations period begins to run when the plaintiff was privy to facts which would provoke inquiry in the mind of a person of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud") (citations & internal quotations omitted); *see also Brown v. Commonwealth Life Ins. Co.,* 22 F. Supp. 2d 1325, 1331 (M.D. Ala. 1998) ("Because the documents which have been presented to this court should have alerted the Plaintiff to the facts which she claims constituted fraud . . . the Plaintiff's claims are untimely.") (citation omitted) (dismissing fraud claims on summary judgment as untimely).

understand the language of his policy and reports (*id.* at 827), the Court ruled that plaintiff was

alerted to the alleged fraud at the latest when he received his 1988 report:

> [A] cursory examination of the 1988 Report read by Casassa upon
> receipt reveals that Liberty Life required that Casassa pay
> premiums, termed "coverage charges," if interest income on the
> reserve amount did not completely offset the coverage and expense
> charge, in order to avoid the Policy's cash value from decreasing.
> ***Although the 1988 Report may be more complex . . . it is not***
> ***vague and is not so complex that it does not reasonably indicate***
> ***that a fraud has occurred.***

*Id.* at 830 (emphasis added) (citations and internal quotations omitted).  Accordingly, this Court

held that Casassa's claims were time-barred because they accrued at the latest in 1988 when he

received the annual report.  *Id.* at 831.[11]

In *Liberty National Life Insurance Co. v. Ingram,* 887 So. 2d 222, 223-24 (Ala. 2004),

the plaintiff alleged that he purchased a life insurance policy based on purported

misrepresentations that it would be "paid up" in ten years.  Ingram also alleged that "the fact that

the interest rate of 9.75% used to arrive at the ten year period was not a guaranteed rate of

interest" was suppressed.  *Id.*  Plaintiff's written policy, delivered ten years prior to suit,

however, guaranteed only a four percent rate of interest.  *Id.* at 225.  Similarly, Ingram was

mailed yearly reports that showed the interest rate declining from its initial rate of 9.75%.  *Id.*

Ingram, who had the equivalent of a seventh-grade education (*id.*), argued that he could not

understand his policy and yearly reports.  *Id.* at 228.  The Alabama Supreme Court disagreed,

holding that Ingram could have read his policy and reports that contradicted the purported oral

---

[11] Although the Court found that Casassa's policy was also inconsistent with the alleged
misrepresentations of the insurance agent, *Casassa* was decided before *Foremost*; thus, unlike
Mr. Leonard, Casassa was under no duty to read the policy when he received it.  *Casassa,* 949 F.
Supp. at 829; *see also Owens,* 289 F. Supp. 2d at 1325 (the *Foremost* decision reestablished a
"duty to read documents received in connection with a particular transaction").

misrepresentations at sale. *Id.* at 229. Accordingly, the statute of limitations barred his claims as a matter of law. *Id.*

Here, the plaintiff complains that he purchased the Policy based on purported representations that "the initial premium . . . was and would always be adequate to fund the original policy terms." Am. Compl. ¶¶ 11-12, 28-29. Plaintiff's Policy, however, contained no such guarantee. To the contrary, and the only no-lapse guarantee in the Policy is for a term of three years, provided the Minimum Monthly Premium is paid, and the Policy guarantees a minimum interest rate of 4.50%. Policy at 5, 7. The Policy also makes it clear that the Policy can and will lapse if a sufficient cash value is not maintained. Policy at 5. Similarly, the Policy reveals that the Policy is a "Flexible Premium" policy and discloses that plaintiff may "[c]hange the amount and frequency of [his] premium payments." Policy at 1-2. The Policy Statement delivered with plaintiff's Policy prominently illustrates that continuing to pay the planned periodic premium will not guarantee the initial amount of coverage ($100,000) for more than three years. Policy Statement at 2. Moreover, beginning as far back as 1993, plaintiff was repeatedly informed that, even if he continued making his quarterly premium payments of $236.75, the Policy would lapse at some point in the future. *See* Boschert Aff. Ex. 3. For instance, the December 1, 1993 Annual Report stated the following:

> If planned periodic premiums are continued, assuming a 7.25%
> interest rate and current charges, your cash value will be depleted
> and ***your policy will lapse on 10/01/2014***. Assuming 4.50%
> interest and guaranteed charges, your cash value will be depleted
> and ***your policy will lapse on 8/01/2000***.

Boschert Aff. Ex. 3, at RLI-52 (emphasis added). Having received this and similar Annual Reports for twelve years prior to filing this lawsuit, there is no question that plaintiff's claims are time barred.

18

In sum, the undisputed record demonstrates that the plaintiff thus was on notice of any purported "fraud" at the time he received his Policy and Policy Statement in 1986. At the very latest, he is chargeable with actual or constructive knowledge beginning with his December 1993 Annual Report. Thus, under *Foremost* and this Court's prior decisions, any tolling of the statute of limitations on plaintiff's claims ceased in 1986, or at the latest, in 1993. Accordingly, the plaintiff cannot succeed in tolling the statute of limitations, and ReliaStar is entitled to summary judgment as a matter of law.

### 2.    Plaintiff's other tort claims are time barred

Alabama's two-year limitations period also governs plaintiff's negligence and wantonness claims (Counts III, IV and V). *Jim Walter Homes, Inc. v. Nicholas*, 843 So. 2d 133, 136 (Ala. 2002). Those claims become ripe as soon as plaintiff began paying premiums on his Policy. *Donoghue*, 838 So. 2d at 1037-38 ("[plaintiff] was paying for something that 'did not exist and never would exist' and that he consequently has suffered injury sufficient to ripen his claims"); *see also Casassa*, 949 F. Supp. at 832 ("In Alabama, a negligence and/or wantonness cause of action accrues as soon as the plaintiff is entitled to maintain the action, *i.e.*, at the time of the first legal injury, regardless of whether the full amount of damages is apparent.") (citations and internal quotations omitted). No tolling mechanism can be employed to save plaintiff's negligence and wantonness claims because these claims are not subject to a discovery rule. *See Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1274 (Ala. 1993) ("There is . . . no 'discovery rule' to toll the running of the limitations period with respect to negligence or wantonness actions; the 'discovery rule' in Alabama is applicable only to fraud actions."); *Casassa*, 949 F. Supp. at 832 n.9 (same). Accordingly, plaintiff's negligence and wantonness claims are time barred as a matter of law.

### 3.    Plaintiff's breach of contract claim is time barred

Alabama's six year statute of limitations bars plaintiff's breach of contract claim (Count VI). *See* Ala. Code § 6-2-34(4); *Casassa,* 949 F. Supp. at 831 (dismissing as time barred the alleged breach of an insurance contract on insurer's motion for summary judgment). Moreover, "[t]he statute of limitations on a contract action runs from the time a breach occurs rather than from the time actual damage is sustained." *AC, Inc. v. Baker,* 622 So. 2d 331, 335 (Ala. 1993); *see also Selma Hous. Dev. Corp. v. Selma Hous. Auth.,* No. 04-0449-WS-B, 2005 WL 1981290, at *17 (S.D. Ala. Aug. 16, 2005) (same) (citation omitted). A breach of contract action based on an alleged oral promise pertaining to an insurance policy, furthermore, accrues "immediately upon issuance, [where] the policies were in nonconformity with, and therefore [in] breach of" the alleged promise. *Alfa Life Ins. Corp. v. Jackson,* 906 So. 2d 143, 151 (Ala. 2005).

The plaintiff has failed to allege any breach of the written insurance contract, so plaintiff's claim can only be based on an alleged oral promise made in 1986. The plaintiff also contends that his Policy was defective "[a]t inception." Am. Compl. ¶¶ 13, 30 & 37. As the Alabama Supreme Court held in *Alfa Life,* plaintiff's breach of contract action accrued "immediately upon [the] issuance" of his Policy. 906 So. 2d at 151. Any alleged breach that occurred in 1986, nineteen years before this action was filed, is time barred and should be dismissed with prejudice.

### B.    Each Of The Plaintiff's Individual Claims Is Deficient As A Matter Of Law

In addition to violating the statute of limitations, each of plaintiff's claims fail as a matter of law for the following reasons.

### 1.    Count I of the First Amended Complaint fails to state a claim of fraud

Plaintiff cannot state a claim of fraud because, as a matter of law, he could not have reasonably relied on the alleged oral representations that were contradicted by plaintiff's written

Policy and Policy Statement. The elements of a fraud claim include (i) a false representation; (ii) concerning a material existing fact; (iii) reasonably relied on by the plaintiff; (iv) who was damaged as a proximate result. *Auto-Owners Ins. Co. v. Abston,* 822 So. 2d 1187, 1196 (Ala. 2001) (citation omitted); *Foremost,* 693 So. 2d at 421 (reestablishing the reasonable reliance standard for fraud claims) (citing *Torres v. State Farm Fire & Cas. Co.,* 438 So. 2d 757 (Ala. 1983)). Under Alabama law, a plaintiff can state a claim of fraud based on a purported misrepresentation only in the "*absence of independent knowledge sufficient to arouse [his] suspicion.*" *Ex parte ERA Marie McConnell Realty, Inc,* 774 So. 2d 588, 591 (Ala. 2000) (emphasis in original) (citation and quotation omitted). Indeed, where a purchaser "closes his eyes where ordinary diligence requires him to see," he cannot state a claim for fraud. *Id.* (internal citations and quotations omitted); *see also Tyler v. Equitable Life Assurance Soc'y,* 512 So. 2d 55, 57 (Ala. 1987) ("[F]raud or misrepresentation cannot be predicated upon a verbal statement made before execution of a written contract when a provision in that contract contradicts the verbal statement.").

In *Baker v. Metropolitan Life Insurance Co.,* 907 So. 2d 419, 420 (Ala. 2005), plaintiff alleged that he was fraudulently induced to purchase a life insurance policy based on purported representations that his policy "would become self-sufficient" after eleven years of premium payments. Plaintiff, however, was given a premium schedule listing that premiums were payable for seventy-three years. *Id.* at 422. The court held that in light of this disclosure, there was no way that reliance on the agent's alleged misrepresentation "was *reasonable.*" *Id.* at 423 (emphasis supplied). Accordingly, summary judgment was affirmed for the defendant without even needing to reach statute of limitations issues because plaintiff could not establish this essential element of fraud. *Id.*

Here, plaintiff alleges that the agent misrepresented that the initial premium "was and would always be adequate to fund the original policy." Am. Compl. ¶¶ 11, 28. Plaintiff's written Policy, however, clearly disclosed that there was no guarantee that the initial $37 bi-weekly premium would fund the initial Policy terms for more than three years. Policy at 5. Moreover, contrary to the purported oral misrepresentation, the Policy disclosed that premiums were "flexible" not fixed. *Id.* at 1. In addition, the Policy provided that "*[n]o agent* or any other person except our elected officers or an Assistant Secretary *can change this contract*." *Id.* at 2 (emphasis added). Further, the Policy Statement depicted in a prominent chart that the initial premium was only guaranteed to maintain a $100,000 face amount for three years. *See* Policy Statement at 2.

Under *Foremost,* the plaintiff had a duty to read his Policy and Policy Statement. *Owens,* 289 F. Supp. 2d at 1325. Accordingly, ReliaStar is entitled to judgment as a matter of law on plaintiff's fraud claim, because plaintiff could not have relied on the agent's alleged representations that were contradicted by the written terms of his Policy and Policy Statement. *See, e.g., Torres,* 438 So. 2d at 759 (affirming summary judgment for defendant where plaintiffs could not have reasonably relied on the agent's alleged representation that was contradicted by the written policy) (cited with approval in *Foremost,* 693 So. 2d at 421).[12]

### 2.    Count II of the First Amended Complaint fails to state an actionable claim for fraudulent suppression or failure to disclose

Similarly, plaintiff fails to state a claim of fraudulent suppression. To recover on a claim of fraudulent suppression a plaintiff must allege and prove "(1) a duty to disclose the facts, (2) concealment or nondisclosure of material facts by the defendant, (3) inducement of the

---

[12] Although *Torres* was temporarily overruled by *Hickox v. Stover*, 551 So. 2d 259 (Ala. 1989), the Alabama Supreme Court subsequently approved the *Torres* case in *Foremost,* when the court overruled *Hickox. Foremost,* 693 So. 2d at 421.

plaintiff to act, and (4) action by the plaintiff to his injury." *Auto Owners,* 822 So. 2d at 1197

(quoting *Foremost,* 693 So. 2d at 423).[13]

> Plaintiff alleges that ReliaStar failed to disclose that his Policy was:

> > an under-funded hybrid universal life insurance product based on excessive interest rates and unsustainable costs of insurance; an annual renewable term rider in which the premiums established and required by Defendant were insufficient to cover the increasing costs of the rider; and higher mortality charges and/or costs of insurance in order to subsidize high credited rates.

Am. Compl. ¶ 37. As an initial matter, the Alabama Supreme Court has explicitly held that an

insurer, absent special circumstances not present here, has no duty to disclose to a policyholder

how it calculates premium pricing. *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 843

(Ala. 1998). Indeed, the Supreme Court expressly criticized the practical ramifications of

imposing a duty on an insurer to disclose its pricing and other internal procedures:

> > To uphold [plaintiff's] claim, we would have to rule that it is the responsibility of every insurer at the point of sale to explain fully to potential customers the insurer's internal procedures, its ratemaking process, and its business practices. To impose that responsibility strikes us as highly impractical, and it is a responsibility we have not imposed in the past.

*Id.*[14]

---

[13] "Although the term 'inducement' has often been used in the description of the fourth element of suppression, it is clear that a plaintiff's . . . 'reasonable reliance' . . . is an essential element of a suppression claim." *Alfa Life Ins. Corp. v. Green,* 881 So. 2d 987, 992 (Ala. 2003) (citations omitted).

[14] *See also Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1313 (11th Cir. 2000) ("retailers are under no obligation to disclose their pricing structure to consumers"); *Ex parte Ford Motor Credit Co.*, 717 So. 2d 781, 787 (Ala. 1997) (there is no "duty that would require the seller of a good or service, absent special circumstances, to reveal to its purchaser a detailed breakdown of how the seller derived the sales price of the good or service, including the amount of profit to be earned on the sale").

Furthermore, "[w]hen a company discloses material facts in the written materials provided to the insured, there is no suppression of fact." *Brown v. Commonwealth Life Ins. Co.*, 22 F. Supp. 2d 1325, 1330-31 (M.D. Ala. 1998) (citations omitted); *see also Ex parte Alfa Mut. Fire Ins. Co.*, 742 So. 2d 1237, 1243 (Ala. 1999) ("Where the record indicates that the information alleged to have been suppressed was in fact disclosed, and there are no special circumstances affecting the plaintiff's capacity to comprehend, the plaintiff cannot recover for suppression."). Indeed, there can be no fraudulent suppression, even where the defendant purportedly "previously made an oral misrepresentation," where the alleged misrepresentation is contradicted by documents the plaintiff receives. *Brown,* 22 F. Supp. 2d at 1330 (quoting *Walker v. TranSouth Fin. Corp.,* No. 95-A-672-N, 1996 WL 406836, at *3 (M.D. Ala. July 10, 1996)).

In *Alfa Life Insurance Corp. v. Green,* 881 So. 2d 987 (Ala. 2003), the plaintiff brought claims of fraud and suppression arising out of the purchase of a whole life insurance policy. The plaintiffs alleged that they purchased the policy based on representations that no premiums would be required beyond the ninth year. *Id.* at 988-89. The plaintiffs were given a "Statement of Policy Values" at the time of purchase, however, that contradicted this alleged misrepresentation. *Id.* at 989. Similarly, plaintiffs' policy stated that additional premiums might be required to keep the policy in force if "interest paid is less than projected, or [] cost of insurance rates are increased." *Id.* at 990. Accordingly, the Alabama Supreme Court held that, as a matter of law, plaintiffs could not show reasonable reliance, and plaintiff's suppression claim was due to be dismissed.

Here, just like *Alfa Life,* plaintiff's Policy and Policy Statement disclosed all "material facts" regarding interest rates, costs of insurance, and premiums necessary to notify plaintiff of

24

the nature of the product he purchased. In particular, the Policy disclosed that premiums were flexible (Policy at 1), that interest rates were subject to change (*id.* at 7), that the costs of insurance would increase every year (*id.* at RLI-007), that the amount and frequency of premiums would affect how long the insurance would remain in effect (*id.* at 4), and that the premium initially established was only guaranteed to keep the initial Policy terms in effect for three years (*id.* at 2). Similarly, the Policy Statement demonstrated that the initial premium was not guaranteed to fund the Policy for more than three years. Policy Statement at 2.

Furthermore, the costs of insurance are not improperly "high" as alleged but rather are "based on the Commissioners 1958 Standard Mortality Table." Policy at 8. Indeed, all costs associated with the Policy, including insurance costs for the Term Insurance Rider, were filed with and approved by the Alabama Department of Insurance. Paquin Aff. ¶¶ 3 & 4 & Exs. 1-2.

For all of the above reasons, the plaintiff's fraudulent suppression claim fails as a matter of law, and the Court should dismiss or grant summary judgment on that claim. *See, e.g., Brown,* 22 F. Supp. 2d at 1331.

### 3.    Counts III and IV fail to state a claim for negligent or wanton hiring, training, or supervision

"A party alleging negligent or wanton supervision and hiring must . . . prove the underlying wrongful conduct of employees." *Voyager Ins. Cos. v. Whitson,* 867 So. 2d 1065, 1073 (Ala. 2003) (citing *Stevenson v. Precision Standard, Inc.,* 762 So. 2d 820, 825 (Ala. 1999)). As a matter of law, plaintiff cannot prove any underlying wrong on the part of ReliaStar's agent because plaintiff's claims are time barred and otherwise defective as a matter of law. *See, e.g., Evans v. Mobile Infirmary Med. Ctr.,* No. Civ.A. 04-0364-BH-C, 2005 WL 1840235, at *18 (S.D. Ala. Aug. 2, 2005) (tort claim that is time barred and otherwise due to be dismissed

"cannot provide the basis to support a claim for negligent supervision"). Accordingly, the plaintiff's negligent and wanton hiring, training, and supervision claims fail as a matter of law.

### 4.    Count V of the First Amended Complaint fails to state a claim that ReliaStar negligently or wantonly failed to procure a suitable product

Plaintiff's own contributory negligence bars as a matter of law his claim for negligent failure to procure suitable insurance. *Kanellis v. Pac. Indem. Co.,* No. 2030860, 2005 WL 1253122, at *6 (Ala. Civ. App. May 27, 2005). In *Kanellis,* plaintiffs sued their insurer for negligent failure to procure insurance after the insurer refused to pay a claim for diminution in value of their vehicle. *Id.* at *1. The Kanellises' written policy, however, provided no such coverage. *Id.* at *6. The court affirmed summary judgment for the insurer (relying on an insured's duty to read his policy documents), and held that the Kanellises' claim was barred by "contributory negligence" which, under Alabama law, "is a complete defense to a claim based on negligence." *Id.* (citations omitted). In particular, the court held that by failing to read their policy and to discover the absence of purported coverage, "as a matter of law, the Kanellises put themselves in danger's way and had a conscious appreciation of the danger of suffering a monetary loss in the event of a collision . . . ." *Id.* (citing *Hannah v. Gregg Bland & Berry, Inc.,* 840 So. 2d 839, 860 (Ala. 2002) (internal quotations and alterations omitted)).

By purportedly failing to discover that the Policy and Policy Statement state that his initial $37.00 bi-weekly premium was only guaranteed to maintain $100,000 of coverage for three years, plaintiff was also negligent by his own admission. Furthermore, plaintiff apparently failed to notice that the Policy is a "Flexible Premium" policy and that he may "[c]hange the amount and frequency of [his] premium payments." The significance of plaintiff's negligence is underscored by his failure to exercise his option to rescind the Policy under the ten-day free look period. Accordingly, as in *Kanellis,* plaintiff's claims are barred as a matter of law by his own

contributory negligence. *See also Torres,* 438 So. 2d at 759 (affirming summary judgment for the insurer where the failure to procure insurance "was attributable to the plaintiffs' carelessness and neglect").

### 5.    Count VI of the First Amended Complaint fails to state a claim for breach of contract

Plaintiff fails to state a claim for breach of contract because, to state such a claim, he *must* specifically identify a provision that was breached. *See*, *e.g.*, *Fike v. Stratton*, 56 So. 929, 934 (Ala. 1911) ("When a breach of contract is relied upon as the gist of the action or defense, it is necessary that the declaration or plea allege a breach, otherwise it will be demurrable."); *Campbell Constr. Eng'rs, Inc. v. Water Works & Sewer Bd.,* 290 So. 2d 194, 198 (Ala. Civ. App. 1974) ("[i]n order that a complaint withstand a demurrer," it must "set forth the essential terms of the contract with reasonable precision and with such certainty and particularity as to acquaint and apprise defendant in what particular he has failed to perform") (citations omitted); *Great Atl. & Pac. Tea Co. v. Summers*, 148 So. 332, 333 (Ala. Ct. App. 1933) ("A complaint for breach of contract must set forth the *essential facts of the breach* with such certainty as will apprise defendant in what particulars he has failed to perform.") (emphasis added).

Plaintiff's only allegation regarding ReliaStar's purported breach of contract is the following: "Defendant has breached the terms of Plaintiff's contract by continually deducting undisclosed and excess costs associated with Plaintiff's term insurance rider from the accumulation value of Plaintiff's base universal policy." Am. Compl. ¶ 54. The First Amended Complaint does not state what contractual provision purportedly setting the costs has been breached. Indeed, it is an undisputed fact that all costs of insurance deducted for Mr. Leonard's $50,000 of base coverage as well as for the $50,000 Term Insurance Rider were less than the maximum amount permitted by the terms of the Policy. Boschert Aff. ¶ 6 & Ex. 1. Moreover,

all costs associated with the Policy and Term Insurance Rider were approved by the Alabama Department of Insurance, Paquin Aff. Exs. 1-2, and were fully disclosed to the plaintiff in each Annual Report. Boschert Aff. ¶ 6 & Ex. 3.

Because there is no genuine issue of material fact, and the undisputed record reflects that ReliaStar did not breach any identifiable provision of the Policy, plaintiff's claim fails as a matter of law. *Great Atl. & Pac. Tea Co.,* 148 So. at 333 (demurrer should have been sustained where breach of contract claim failed to state the particulars that the defendant failed to perform).

## II.   THE COURT SHOULD STRIKE PLAINTIFF'S NATIONWIDE CLASS ACTION ALLEGATIONS

For the reasons set forth above, this Court should enter summary judgment for ReliaStar with respect to all claims in the First Amended Complaint. If the Court dismisses less than all claims, the Court should strike the plaintiff's class action allegations because, on the face of the First Amended Complaint, these claims present insurmountable problems of manageability. For example, the plaintiff pleads a claim for "fraud" based on an alleged oral representation, while at the same time admitting that this Court would be forced to apply the laws of all fifty states. *See* Am. Compl. ¶ 2 (the claims of the putative class are "founded upon the common law of Alabama *and all other states in these United States*") (emphasis added). Given this concession, under Eleventh Circuit law, a multi-state class is an impossibility as a matter of law.

The Eleventh Circuit has held that certifying a nationwide class is not feasible where fifty states' laws must be applied because "even where state laws differ only in nuance, nuance can be significant, leaving [a] district court with the *impossible task* of instructing a jury on the relevant law." *Andrews v. Am. Tel. & Tel. Co.,* 95 F.3d 1014, 1024 (11th Cir. 1996) (emphasis added) (citations and internal quotations omitted). Similarly, in *Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1367 n.44 (11th Cir. 2002), the Eleventh Circuit determined that the application of the fifty

states' laws "alone would render the class unmanageable." (citing *Andrews*, 95 F.3d at 1024; *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741-43 & n.15 (5th Cir. 1996) (differences in the states' fraud and negligence laws preclude nationwide certification); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300-01 (7th Cir. 1995) (differences in the states' negligence laws render a nationwide class unmanageable)). Accordingly, by conceding on its face that the law of all fifty states would need to be applied, the First Amended Complaint renders a national class untenable as a matter of law. The Court should thus strike and dismiss the national class action allegations. *See Chilton Water Auth. v. Shell Oil Co.*, No. Civ. A. 98-T-1452-N, 1999 WL 1628000, at *8 (M.D. Ala. May 21, 1999).

The district court faced a similar situation in *Chilton*, where the plaintiff brought a putative nationwide class action alleging claims of fraud and negligence. On the defendant's motion to strike, this Court struck the nationwide class allegations as "unmanageable." *Id.* The Court held that "fraud is inherently an ***inappropriate claim*** to be resolved on a nationwide class basis" because of differing state standards on reliance and the duty to disclose. *Id.* at *7 (emphasis added) (citing *Mack v. Gen. Motors Acceptance Corp.*, 169 F.R.D. 671, 677-78 (M.D. Ala. 1996)). The Court found that the "same problems which plague[d] plaintiffs' fraud claims also plague[d] their negligence claim." *Id.* at *8. The Court held that:

> The law of negligence, including subsidiary concepts such as duty of care, forseeability, and proximate cause may . . . differ among the states only in nuance, . . . [b]ut nuance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts.

*Id.* (alteration in original) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996)); *see also In re Rhone-Poulenc*, 51 F.3d at 1300-01 ("The voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch."). Further, the Court found

that plaintiff's request for punitive damages "also complicate[d] resolution of this matter on a class basis [because] . . . [s]tates differ in their treatment of punitive damages." *Chilton,* 1999 WL 1628000, at *8 (citing *Mack,* 169 F.R.D. at 678); *accord Dubose v. First Sec. Sav. Bank,* 183 F.R.D. 583, 588 (M.D. Ala. 1997)).[15]

Additionally, in this case, the plaintiff's fraud, negligence, and breach of contract claims, which are further complicated by plaintiff's request for punitive damages, are inherently unmanageable and impossible to adjudicate in a class action because they would involve countless individual issues arising out of each policyholder's individual transaction and unique circumstances. *See, e.g., Sikes,* 281 F.3d 1350, 1365 (11th Cir. 2002) (decertifying putative RICO mail and wire fraud class because "class members must show, *on an individual basis,* that they relied on the misrepresentations") (emphasis in original) (quoting *Andrews v. Am. Tel. & Tel. Co.,* 95 F.3d 1014, 1023 (11th Cir. 1996) (decertifying RICO fraud class); *Briggs v. Countrywide Funding Corp.,* 183 F.R.D. 576, 582 (M.D. Ala. 1997) ("there appears to be no way to resolve the reliance issue on a class wide basis") (citations and internal quotations omitted); *Dubose,* 183 F.R.D. at 588 ("[r]esolution of [fraud] claims . . . will require the court to examine the facts and circumstances of each individual case"); *Mack,* 169 F.R.D. at 678 ("resolving the issue of reliance will require the court to examine the representations made . . . to each claimant"). Accordingly, the plaintiff's class allegations should be stricken.

---

[15] In the same way, a breach of contract claim can prove impossible to manage on a nationwide basis because "the Court would have to conduct thousands of fact-intensive mini-trials to determine breach and damages with respect to each [class] member's contract-based claims . . . [and] the laws of 50 jurisdictions would be applicable to these claims." *Clopton v. Budget Rent A Car Corp.,* 197 F.R.D. 502, 509 (N.D. Ala. 2000) (citations omitted); *accord Shelley v. AmSouth Bank,* No. Civ.A.97-1170-RV-C, 2000 WL 1121778, at *11 (S.D. Ala. July 24, 2000) (breach of contract claim "raises individual issues that predominate over common issues"), *aff'd,* 247 F.3d 250 (11th Cir. 2001).

## CONCLUSION

For the reasons set forth above, the First Amended Complaint is barred by the statute of limitations, and the plaintiff's claims are defective as a matter of law. Accordingly, this Court should enter an Order granting summary judgment to ReliaStar and dismissing the First Amended Complaint with prejudice.

Respectfully submitted,

/s/ S. Andrew Kelly
Michael L. Bell, Esq. (BELLM6182)
S. Andrew Kelly, Esq. (KELL3760)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203-3200
Telephone: (205) 581-0700
Facsimile: (205) 581-0799

Markham R. Leventhal (Fla. Bar #616140)
Stephan I. Voudris (Fla. Bar #135542)
Ben V. Seessel (Fla. Bar. #598585)
JORDEN BURT LLP
777 Brickell Avenue, Suite 500
Miami, Florida 33131-2803
Telephone: (305) 371-2600
Facsimile: (305) 372-9928

*Attorneys for Defendant*
*ReliaStar Life Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Jere L. Beasley, Esq. (libby.rayborn@beasleyallen.com)
W. Daniel Miles, III, Esq. (dee.miles@beasleyallen.com)
Joseph H. Aughtman, Esq. (jay.aughtman@beasleyallen.com)
John E. Tomlinson, Esq. (john.tomlinson@beasleyallen.com)
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
P.O. Box 4160
Montgomery, AL  36103-4160

/s/  S. Andrew Kelly

145858